IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: <br> PHARMACY BENEFIT MANAGERS <br> ANTITRUST LITIGATION | Master File No. <br> Civ. No. 2:06-MD-1782 <br><br> Judge C. Darnell Jones, II |
| THIS DOCUMENT RELATES TO: | |
| *North Jackson Pharmacy, Inc. v.* <br> *Caremark RX Inc., et al* <br> Case No. 2:06-cv-4305 | |

## PLAINTIFFS' CASE STATUS REPORT

Currently pending before the Court is Plaintiffs' Motion to Certify the Class[1]. (Dkt. No. 180). Plaintiffs are filing this report to update the Court regarding Caremark's production of a sampling of relevant data in response to the Court's January 24, 2013 Order and regarding analysis of Caremark's data by Plaintiffs' expert.

In earlier reports, Dr. Charles Cowan proposed tests that could be performed to determine whether reimbursements to independent pharmacists are below what they would have been in a truly competitive market; Dr. Cowan, however, could not perform the tests because Caremark had not produced the relevant data.[2] On September 23, 2014, Plaintiffs filed the expert report of Paul J. Seguin, Ph.D. (Doc. 202-1) which reliably demonstrates that antitrust impact and

---

[1] Plaintiffs filed a "Motion to Certify the Class or, in the Alternative, Motion to Compel Discovery." On January 24, 2013, the Court ordered Caremark to produce supplemental discovery. Class certification is appropriate for the reasons set forth in Plaintiffs' Motion to Certify the Class which is now buttressed by Dr. Seguin's expert report.

[2] Dr. Cowan's previous reports are attachments B, C and D to Dr. Seguin's expert report.

1

damages can be proven at trial using common evidence. Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Certify the Class.

## I.   CAREMARK'S DATA PRODUCTION AND EXPERT ANALYSIS

Caremark has now produced transactional data containing all brand name prescriptions filled for customers who had a prescription plan managed by a PBM for the calendar years of 2005 and 2008. Seguin Report, p. 3. A total of 78,543,701 records were produced. *Id.* Dr. Seguin supplemented the data to include additional variables which would capture the locational-specific economic and competitive environment including median income for each zip code, the population for each zip code, the number of pharmacies within the zip code, the number of pharmacies within a chain and an indicator as to whether the number of pharmacies within the chain is five or fewer. Seguin Report, p. 4.

Using ordinary-least squares estimation and the example of Lipitor where 1,745,461 prescriptions filled across all pharmacies in 2005 for Caremark for PBM members, Dr. Seguin determined that reimbursement for Lipitor in 2005 for independent pharmacies was $1.00 less per fill than would be expected in a competitive market. Seguin Report, p. 4-6. Accordingly, Dr. Seguin calculated the damages incurred by class members for Lipitor prescriptions in 2005 by multiplying the number of fills by class members in 2005 (300,148) by $1.00 for a total of $300,103.45[3].

Based on his analysis of Caremark's data, Dr. Seguin concludes that "reimbursement discrimination is prevalent and is significant both statistically and economically." Seguin Report, p. 3. Dr. Seguin determined that independent pharmacies received reimbursements that were both economically importantly and statistically reliably different than those received by

---

[3] Dr. Seguin notes that the differential is more precisely stated as $0.99985. Seguin Report, p. 6 n.3.

pharmacies that are members of a chain. Seguin Report, p. 1, 3. In fact, Dr. Seguin determined that independent pharmacies received, on average $1.73 less per non-generic (or "name brand") prescription filled. Seguin Report, p. 1.

The sum, across all non-generic drugs filled at least 120 times for Caremark PBM members, equals $12,308,601 for 2005 and $10,703,061 for 2008 for aggregate damages for these two years totaling $23,011,622. Seguin Report, p. 7. As Dr. Seguin explains, with the appropriate data, he can reliably determine damages for any year by performing a regression analysis for each drug included in the data, then multiplying the estimate of the reimbursement differential coefficient by the number of fills for that formulation and then summing the damages for the different drugs. Seguin Report, p. 6-7. Moreover, Dr. Seguin can also allocate the aggregate for each drug for each year amount to each member of the class. Seguin Report, p. 6.

Caremark's supplemental production has permitted Plaintiffs' expert to demonstrate a methodology for establishing class-wide injury and damages utilizing common evidence. Once Caremark produces the necessary additional data, Dr. Seguin can readily apply this methodology to determine the class-wide impact of Caremark's anti-competitive behavior for the entire class period. Seguin Report, p. 13.

In addition to analyzing Caremark's data, Dr. Seguin also demonstrates that the market share of independent pharmacies continues to decrease. Seguin Report, p. 1, 10-11. In his previous reports, Dr. Cowan determined that the market share held by independent pharmacies fell throughout his period of analysis which ended in 2003. Seguin Report, p. 10. Dr. Seguin updated Dr. Cowan's analysis for the intervening timeframe and concluded that "[b]oth relative and absolute numbers irrefutably demonstrate that the trend originally identified" by Dr. Cowan "using data from 1992 through 2003 persists." Seguin Report, p. 11. Given the aging of the

3

population, the rapidly increasing demand for pharmaceuticals, the increasing sophistication of the pharmaceutical companies in marketing their products and the passage of the Medicare Modernization Act in 2003, "one could naturally assume that the number of pharmacy outlets should experience increases regardless of their ownership structure." Seguin Report, p. 11. "That the number of IP outlets actually *fell* over this period strongly suggests that the common harm or 'suffering' by Independent Pharmacies due to discriminatory reimbursement by PBMs endure." Seguin Report, p. 11. Finally, Dr. Seguin outlines how, with sufficient discovery, he can feasibly empirically test for the presence of anti-trust behavior based on mail order pharmacy competition, uninsured clients and the employment market for active pharmacists. Seguin Report, p. 11-13.

## II.     DR. SEGUIN'S EXPERT REPORT ESTABLISHES PREDOMINANCE

As set forth in the motion for class certification, Plaintiffs' claims satisfy each requisite of Rule 23(a) and (b).  Dr. Seguin's report further demonstrates that Plaintiffs' claims easily satisfy the predominance requirement for class certification under Rule 23(b)(3). "Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310-311 (3d Cir. 2008) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  In considering whether common issues predominate, the court must consider the "elements of plaintiffs' claim 'through the prism' of Rule 23." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 (3d Cir. 2001)).  As in *Hydrogen Peroxide*, "The elements of plaintiffs' claims are (1) a violation of the antitrust laws–here, § 1 of the Sherman Act, (2) individual injury resulting from that violation, and (3) measurable damages." *Id.* at 311.  Courts routinely find "that the existence and scope of an alleged conspiracy are

matters susceptible to class-wide proof, and thus tend to support a finding that common issues predominate over individual ones as to at least the first element of an antitrust conspiracy claim." *Cason-Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 538 (E.D. Mich. Sept. 13, 2013) (citing *In re Blood Reagents Antitrust Litigation*, 283 F.R.D. 222, 234 (E.D. Pa. 2012)).

The second element – "individual injury"— is also referred to as antitrust impact. *Hydrogen Peroxide*, 552 F.3d at 311. Antitrust impact refers to the "fact of damage." *Bosagian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977), *abrogated on other grounds* by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). "Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)." *Newton*, 259 F.3d at 188. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("[Plaintiff's] burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.")

Proof that plaintiffs have been paid less than they would have been paid absent the conspiracy constitutes an antitrust injury. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) ("Having concluded that paying West Penn artificially depressed reimbursement rates was an anticompetitive aspect of the alleged conspiracy, it follows that the underpayments constitute an antitrust injury.") *See also Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 962 (10th Cir. 1990) (finding plaintiff's "alleged injury resulting from its reduction of its maximum allowable payments" by Blue Cross of Kansas adequately stated antitrust injury); *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) (noting that "buyer cartels, the object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal per se"); *Omnicare, Inc. v.*

*UnitedHealth Group, Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) ("In a buyers' conspiracy case, a seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel").

At the class certification stage, Plaintiffs are not required to prove antitrust injury. *Hydrogen Peroxide*, 552 F.3d at 311. "Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311-312. Dr. Seguin's report demonstrates that antitrust impact can be proven at trial using common evidence.

Courts have routinely held that regression and benchmark analyses are acceptable methods for establishing antitrust impact and damages. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002). *See also In the Matter of the Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1320 (7th Cir. 1992) ("If done right, regression analysis permits an inference of causation and of the size of the effect.") In fact, the Third Circuit in *Hydrogen Peroxide* specifically noted that the plaintiffs' expert "had not completed any benchmark or regression analyses." *Hydrogen Peroxide*, 552 F.3d at 315. Dr. Seguin's analysis also properly accounts for additional relevant variables.

Moreover, Dr. Seguin's report is supported by reliable evidence including Caremark's own transactional data. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (finding the expert's "but for" analysis to be flawed where the expert used profit and volume projections without knowing the circumstances of their creation rather than using "actual financial data"). *See also In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *24 (M.D. Fla. Apr. 3, 2014) (finding expert's failure to take available transactional data "into account within his regressions precludes a finding that he has provided a workable methodology

for applying common evidence to common questions that predominate"); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 220 (M.D. Pa. 2012) (noting expert's use of transactional data); *In re Plastics Additives*, 2010 WL 3431837, at *4 (E.D. Pa. Aug. 31, 2010) (finding expert's regression analysis to be flawed where the expert utilized price lists which did not necessarily reflect class members' experiences).

Dr. Seguin's report meets the standard the Court found sufficient in *In re Blood Reagents Antitrust Litigation*:

> Dr. Beyer utilizes a benchmark model to estimate the pricing that would have occurred in a lawful duopoly. He concludes that any differences between those estimated prices and the actual prices charged by defendants resulted from the alleged price-fixing conspiracy. The important point for purposes of the impact analysis is that, by applying one variation of this benchmark model to transactional data produced by defendants, Dr. Beyer has demonstrated that "virtually all customers paid more for traditional reagents than they would have paid in the absence of the alleged anticompetitive conduct." Dr. Beyer's calculations show that virtually all of defendants' customers purchased at least one TBR product for more than the but-for price during the class period. The calculations are persuasive evidence that antitrust impact is "susceptible to proof at trial through available evidence common to the class." *Behrend,* 655 F.3d at 198.

283 F.R.D. 222, 239 (E.D. Pa. 2012)(citations omitted).

In addition to setting forth and explaining an acceptable and reliable methodology for proving antitrust impact using common evidence, Dr. Seguin also anticipates and effectively addresses Defendants' anticipated objections.  First, Dr. Cowan did not have access to data and, therefore, could not demonstrate the feasibility of his proposed tests. Using the sampling of data produced by Caremark, Dr. Seguin has now performed the anticipated analysis. Second, as Dr. Seguin notes, Snyder previously argued that the proposed tests could not distinguish between legal conduct and illegal conduct.  Yet, as Dr. Cowan explained, statistical analysis is utilized to establish a pattern that might not be discernable when viewing individual transactions.  Having performed an "analysis of millions of transactions" Dr. Seguin has confirmed that the data

"reliably demonstrates a statistically significant and economically meaningful pattern of reimbursement discrimination." Seguin Report, p. 9. Third, Dr. Seguin addresses the fallacy of Snyder's objections by noting that "Snyder conflates accounting loss with economic harm by insisting that damages can only be shown after demonstrating that reimbursement is less than some measure of costs." Seguin Report, p. 9. Dr. Seguin explains that he can show economic harm by demonstrating that (1) reimbursement rates are too low; (2) that they are differentially low for independent pharmacies, and (3) that revenues to class members are lower than they should have been. Seguin Report, p. 9. Finally, Dr. Seguin notes that despite Snyder's expressed concerns regarding the feasibility of Dr. Cowan's proposed test, Dr. Seguin has in fact demonstrated the feasibility of the proposed analysis by (1) specifying the data he employed; (2) investigating, receiving and analyzing the requisite data; and by (3) feasibly estimating numerous statistical models. Seguin Report, p. 9. Plaintiffs have shown by a preponderance of the evidence that class-wide antitrust injury can be proven at trial based on evidence that is common to the class.

Finally, the element of aggregate damages can be proven using common evidence. "The inquiry for a district court at the class certification stage is whether the plaintiffs have demonstrated by a preponderance of the evidence that they will be able to measure damages on a class-wide basis using common proof." *Behrend v. Comcast Corp.*, 655 F.3d 182, 204 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1426 (2013). Plaintiffs' damages model which measures the amount class members were underpaid as a result of the conspiracy is limited to and reflects a theory of liability that remains at issue in this litigation. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). As Dr. Cowan noted, the methodology for determining impact immediately leads to a method for computing damages. Expert Report of Charles D. Cowan,

March 15, 2006, p. 50. Dr. Seguin's damage formulation utilizes Caremark's own transactional data and involves mathematical and formulaic calculations establishes a method for computing aggregate damages using common evidence.

### III. FURTHER PROCEEDINGS

Plaintiffs understand from Caremark that it desires to take the deposition of Dr. Seguin and submit a counter expert report. Plaintiffs, of course, want to take the deposition of Caremark's expert and reserve the right to reply to whatever Caremark may file. Defendants have suggested a period of approximately eight months to accomplish this discovery and briefing and Plaintiffs do not object as long as that time can be apportioned equitably between the parties. Plaintiffs are prepared to submit additional briefing on the issue of class certification while the expert reports and discovery proceeds or immediately thereafter, as the Court prefers.

### IV. CONCLUSION

As Dr. Seguin's report demonstrates, common issues predominate with regard to each element of Plaintiffs' claims. Plaintiffs submit that the Court grant Plaintiffs' motion for class certification and allow class-wide discovery to proceed, after any necessary additional proceedings that the Court may determine to be appropriate.

Dated:  January 15, 2014               /s/*Joe R. Whatley, Jr.*
                                        Joe R. Whatley, Jr.
                                        **WHATLEY KALLAS, LLP**
                                        2001 Park Place North, Suite 1000
                                        Birmingham, AL 35202
                                        (205) 488-1200
                                        jwhatley@whatleykallas.com

Robert M. Foote
Kathleen Chavez
**FOOTE, MIELKE, CHAVEZ & O'NEIL**
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450
rmf@fmcolaw.com
kcc@fmcolaw.com

Kenneth I. Trujillo
**SCHNADER HARRISON SEGAL**
  **& LEWIS, LLP**
1600 Market Street, Suite 3600
Philadelphia, PA 19103-6275
(215) 751-2000
(215) 751-2205 Fax
ktrujillo@schnader.com

Archie C. Lamb, Jr.
**ARCHIE LAMB & ASSOCIATES, LLC**
2900 1st  Avenue South
Birmingham, AL 352333
(205) 324-4644
(205) 324-4649 Fax
alamb@archielamb.com

Edward Kirk Wood, Jr.
**LAW OFFICE OF**
**EDWARD KIRK WOOD**
P.O. Box 382434
Birmingham, AL 35233
205-612-0243
205-324-4649 Fax
ekirkwood1@cs.com

Dennis G. Pantazis
**WIGGINS CHILDS PANTAZIS**
  **FISHER GOLDFARB**
301 19th Street, North
The Kress Building
Birmingham, AL 35203
205-314-0500
205-254-1500 Fax
dgp@wigginschilds.com

Nicholas B Roth
**EYSTER KEY TUBB WEAVER & ROTH**
402 East Moulton Street, SE
Decatur, AL 35601
(256) 353-6761
(256) 353-6767 Fax
nbroth@ektwr.com

Mark K. Gray
**GRAY & WHITE**
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email:  mgray@grayandwhitelaw.com

Harley S. Tropin
**KOZYAK TROPIN &**
 **THROCKMORTON, P.A.**
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email:  hst@kttlaw.com

***Attorneys for North Jackson Pharmacy Inc., et al.***

## **CERTIFICATE OF SERVICE**

      I hereby certify that on January 15, 2015, I caused a true and correct copy of the foregoing to be filed and served on all counsel of record via the court's Electronic Case Filing ("ECF") system. This document is available for viewing and downloading from the ECF system.

                                                 /s/ *Joe R. Whatley, Jr.*
                                                 Joe R. Whatley, Jr.